(No. 5688 )

DOROTHY BARFIELD, PHILLIP BARFIELD, a minor, BARBARA BARFIELD, a minor, and VERNELL BARFIELD, a minor, by HOBERT BARFIELD, their father and next friend, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed June 7, 1973.*

ROBERT V. NEELY, Attorney for Claimants.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER and DOUGLAS G. OLSON, Assistant Attorneys General, for Respondent.

PERLIN, C.J.

Claimants, Phillip Barfield, Dorothy Barfield, Barbara Barfield and Vernell Barfield, seek recovery of $5,000, $1,000, $5,000 and $25,000, respectively, for injuries incurred when the automobile in which they were riding and which claimant, Phillip Barfield, was driving skidded through a T-intersection and into a ditch on the other side of the intersection. Claimants admit that a stop sign guarded the intersection but contend that the proximate cause of the accident was the failure of the State of Illinois to provide adequate warning of the approaching stop sign and T-intersection. The road on which the claimants were

330

driving was a county road which the State of Illinois had contracted to improve.

The events which led to the accident out of which this cause of action arises are not in dispute. On the evening of October 5, 1967, claimant, Phillip Barfield, driving his father's 1965 Ford stationwagon, left his home in Karnak, Illinois, en route to a high school basketball game in Joppa, Illinois. He carried six passengers: Cleotis Pounds; Ricky Johnson; claimant, Vernell Barfield; Vivian Ladd; claimant, Dorothy Barfield; and claimant, Barbara Barfield. Phillip Barfield drove east from Karnak on Illinois Route 169, then turned right, south, on to Massac County Road, designated 34-Q. 34-Q connects route 169 with West Grand Chain Road, the principal path to Joppa. This link is about three and one-half miles long and deadends at West Grand Chain, forming a T-intersection. Barfield drove the stationwagon southward along 34-Q at thirty-five to forty miles per hour.

Earlier in the day it had rained. A residue of water and, in some places, mud remained on the road. It was about 8:00 p.m. when Phillip made the turn on to 34-Q. Night had fallen. The Ford's headlights were on and beaming ahead.

34-Q is a straight road. It is tilted gradually downhill from its north end, Route 169, and levels off at a point about a quarter of a mile from its southern terminus, West Grand Chain Road. On the night of the accident, a thirty-six inch stop sign stood on the right shoulder of 34-Q immediately in front of the intersection of 34-Q and West Grand Chain. The stop sign faced north, and it was properly located. It was designed to protect the intersection from motorists driving south on 34-Q. No obstructions blocked such a motorist's vision of this sign. There were no other signs on 34-Q warning of the upcoming intersection.

Claimant was aware as he traveled down 34-Q that an

intersection lay ahead but he did not know exactly where it was. He reached what turned out to be the southern end of 34-Q without reducing his speed. Claimant did not see the stop sign until he was four or five car lengths from it. Upon seeing it, he applied the brakes, turning the wheel to the left at the same time. The brakes took hold but the Ford slid by the stop sign, through the intersection, across West Grand Chain Road and into a ditch on the south side of Grand Chain. Phillip, Dorothy, Barbara and Vernell Barfield were severely injured.

34-Q was, and is today, a county road. At the time of the accident, the State of Illinois was in the final stage of a project to improve the road under agreements with Massac County and the federal government. The road had already been widened and resurfaced. It is not clear what if anything remained to be done but a state engineer was still on the job. The major part of the construction work had been performed by a subcontractor, The Midwest Construction Company, under the supervision of the State of Illinois. Although there is testimony that dirt, which may have been left from the construction work, spotted the road, it is not alleged that the State was negligent in its supervision of the road improvement or in leaving the road itself in the condition it was in on the night of the accident.

The agreement between Massac County and the State of Illinois did not expressly allocate the duty to maintain traffic safety signs on 34-Q. It is clear that before the agreement, Massac County had exclusive jurisdiction over the road with the attendant obligation to provide traffic signs. It was the county which had placed the stop sign at the southern end of 34-Q. The agreement did provide that upon completion of the improvement, the maintenance of traffic warning signs would be the responsibility of Massac County.

Claimants base their claim for compensation from the State on the theory that the State was negligent in failing to erect a "Stop Ahead" sign or some other warning sign on 34-Q to alert drivers to the T-intersection which lay ahead. Such a duty, claimants assert, existed because the State could reasonably have foreseen the conditions which caused this accident—darkness, a wet and muddy road. This duty adhered to the State even though 34-Q was a county road because the State had assumed temporary "jurisdiction" over 34-Q by undertaking to improve it.

Respondent argues that as 34-Q at all times remained a county road, never becoming part of the Illinois State highway system, no duty devolved upon the State to place and maintain traffic control devices. The State's supervision did not create such a duty because the State which authorized the work specifically precluded that possibility. Respondent also takes the position that even if 34-Q did temporarily fall within its jurisdiction, the posting of a warning sign was not necessary to the fulfillment of its jurisdiction. The posting of a warning sign was not necessary to the fulfillment of its duty of care toward motorists traveling south on 34-Q.

In order for claimants to recover, they must prove by a preponderance of evidence (1) that respondent was negligent; (2) that such negligence was the cause of the accident in question; and (3) that claimants were in the exercise of due care for their own safety and, therefore, free from contributory negligence.

Before reaching the negligence issue, we must resolve the threshold question of whether the State owed claimants any duty of care. The State of Illinois is not liable for the acts or omissions of its political subdivisions. *Schwartz* vs. *State of Illinois*, 22 C.C.R. 739, 740 (1958). If the need for a warning sign on 34-Q in fact existed, either Massac County or the State of Illinois was obliged to meet that need.

The agreement under which the construction was performed and whereby claimants allege jurisdiction over the road temporarily passed from the county to the state is ambiguous on the duty to maintain traffic signs. However, the Federal Aid Road Act which authorized the agreement and is expressly referred to in the agreement contains the following language:

"* * *

"The local highway authorities having jurisdiction over a highway or street prior to its selection and designation as part of the federal aid secondary network shall continue to be responsible for its maintenance until such time as it had been constructed as provided herein. After a highway has been so constructed, the department is authorized to maintain it, or, with the approval of the Bureau of Public Roads, to enter into formal agreement with the appropriate officials of the county in which such highway is located, either prior to or after construction, for its maintenance at the expense of such county.* * *" *Ch. 95½, Sec. 11-301, Ill. Rev Stat. (1971)*

If the words of this statute are to be given their ordinary meaning, this court is compelled to hold that the state's supervision of road construction on 34-Q did not create a duty of care to claimants, at least not on the basis of a transfer of "jurisdictional" authority over the roadway's safety.

The above statute does not dispose of this issue. *Riggins* vs. *State of Illinois*, 21 C.C.R. 434, 438 (1953) cited by claimants, stands for the proposition that when the state is in the process of repairing a highway it is duty bound to use reasonable care in warning the traveling public of any hazard it has voluntarily created. This duty is not a statutory one, relying for its force on existing or assumed jurisdiction over the road. This is the general duty of care applicable to any road construction contractor. Ownership and jurisdictional questions are irrelevant. See also *Sundin* vs. *Hughes*, 246 N.E.2d 100 (1969) and *Mammer* vs. *State of Illinois*, 23 C.C.R. 130 1135 (1959).

A fundamental difficulty in applying the doctrine of *Riggins, Mammer* and *Sundin* cases to the facts of the

instant case lies in the distinction between dangers arising from a construction project in progress which itself represents a roadway hazard (e.g., barricades, tractors, detours) and dangers which arise from a fundamental change in the nature of a roadway wrought by a completed improvement (e.g., new surface, more lanes, new intersection). In the latter example, the one which most nearly approximates the case before us, potential hazards, although non-existent but for the road construction, do not stem directly from it, and road builders, having neither the authority nor the expertise to make traffic safety policy decisions, are not held responsible for correcting them.

This distinction may carry less weight where the State is the construction contractor. Were the State to walk away from a construction project in which its participation was disproportionately large compared to that of the local jurisdictional authority, leaving hazards directly or indirectly arising from its work (*Riggins* vs. *State of Illinois*) might compel imposing liability on the State. This, however, is not the situation in the case before us. We find for the reasons discussed below that the State's failure to pose a "Stop Ahead" sign on 34-Q did not expose motorists to sufficient danger to amount to negligence assuming even the most complete duty of care existed.

The purpose of a "Stop Ahead" sign, not surprisingly, is to warn motorists that a stop sign lies ahead. Its use is largely discretionary and it was never intended that this sign precede every stop sign in the state. Where a motorist's view of a stop sign is so obstructed that he does not have sufficient time to stop, the use of a "Stop Ahead" sign becomes mandatory. The statute which prescribes the state's duty to employ these signs lists the following obstructions requiring its use:

"horizontal or vertical curves, parked vehicles or foliage and highway approach speeds . . . and cases where there is poor observance of stop signs."

The record of this case reveals that none of the above conditions existed. There was at least 1300 feet and perhaps as much as 3,000 feet of unobstructed vision to the stop sign at the T-intersection of 34-Q available for motorists traveling south. It has been held in this state that the failure to maintain a "Stop Ahead" sign where the stop sign was visible for a distance of 1,000 to 500 feet was not negligence. *Shivas* vs. *State of Illinois*, 25 C.C.R. 256, 260 (1965).

This Court has made the following statement:

" . . . The 'Stop Ahead' sign in question was not mandatory within the foregoing statutory requirements, but only permissive, and need not have been placed at the location in question at all. The Court concludes it must follow that failure to maintain a sign which was not required to be placed in the first instance in no way constitutes negligence." *Shivas*, supra at 260.

The primary obstruction of claimants' view was the darkness of night. A contributing cause to their failure to stop in time was the slippery condition of the road which had become wet and muddy from an afternoon rain. Roads are improved and warning signs posted to regulate the normal flow of traffic under normal conditions of a specific area and to warn motorists of existing hazards which they cannot anticipate. The State is not obligated to warn motorists of natural hazards, the presence of which they are fully apprised of, the effects of which they are already familiar with. Darkness and rain combine to make driving hazardous by restricting visibility, turning dirt into mud and dry asphalt into slick asphalt. A reasonably prudent man is deemed to be aware of these physical processes and their resulting danger. No additional warnings are necessary. *Newcomm* vs. *Jul*, 273 N.E.2d 699 (1971). The condition of 34-Q on the night of the accident, made hazardous by the natural phenomenon, would not have required an additional warning sign if none would have been required under dry, daylight conditions. As we have stated above, no "Stop Ahead" sign was necessary under

336

those conditions. Accordingly, claimants have failed to sustain the burden of proving negligence in failing to erect the sign.

The fact that mud contributed to claimant's slide into the ditch, mud which represented dirt left behind by the State's subcontractor, does not alter the result of this case. It has not been shown to this Court's satisfaction the extent to which dirt was in fact on the road, or that it was left from the construction work, or that it represented anything more than a natural runoff from the shoulder during the rain. Resolving these questions in claimants' favor merely shifts the focus of this case to contributory negligence. As claimants admit awareness of these conditions yet failed to take reasonable precautions in light of them, recovery would nonetheless be barred for failure to prove freedom from contributory negligence. *Clark* vs. *Quincy Housing Authority*, 229 N.E. 2d 780, Ill.App. 2nd 458.

Recovery is therefore denied.